Good morning, Your Honors. May it please the Court, I'm Justin Augustine on behalf of Appellants, and I'd like to try to please reserve two minutes for rebuttal. Thank you. All right. Please watch your clock. So the issue before us today is whether 21-inch trees within the Decoyer Project area qualify as generally small-diameter timber under the Roadless Area Conservation Rule. And as a rule contains an overall prohibition on timber cutting. That's the title of 36 CFR 294.13. And that matters here because when we're discussing the exception for generally small-diameter timber, we need to remember that that needs to be narrowly construed in order to reserve the overall intent of the regulation. That said, it's the rules preamble that I want to jump into most today, because it's the rules preamble that not only emphasizes why the rule is a narrow one, it also really underscores why the Forest Service's approach in this case is unreasonable. So specifically, the preamble states that the intent of the rule is to limit cutting of timber to those areas that are overgrown. And not only does the preamble state that this circuit in the Decoyer 1 case in 2022 likewise found that the Forest Service must meet that intent. You're not disputing this area is overgrown though, are you? I'm sorry? You're not really disputing that the area is overgrown. I thought you were just disputing how to deal with it. If I'm understanding correctly, yes, I am disputing that particular trees are overgrown. We don't know. Sorry, when you were just reading from the preamble, weren't you talking about whether there's like a fire risk because there are too many trees? I'm going to get to the fire risk issue, but from my perspective, the first question we have to answer and show is what trees within the project area are actually overgrown? All they've done is present data, but they haven't actually provided a technical analysis that shows why particular trees that they're going to cut are actually overgrown. I think you're mixing terms up a little bit. My understanding of the purpose of the rule is the exception when they allow cutting is if the forest area is overgrown, and I don't see anything in the briefing or record suggesting that there is a dispute that this area of the forest, that there is overgrowth. The only issue is the service's determination that 21 inch DBH is generally small size diameter and can be cut for the purpose of dealing with the overgrowth. I mean, how do you define overgrown if you dispute that, my understanding? Well, that's to me the underlying problem. They haven't explained why 21 inch trees in particular are overgrown. No one disputes that there are some overgrown trees in this area. I agree with that. I don't think they're talking about overgrown trees. I think they're talking about too much density of forest, too many trees in the area that's causing a fire risk. So I think you're using overgrowth, and I don't think you did this in your brief, so this is like a weird twist that's happening right now. I think you were saying they're dealing with the fire hazard in the wrong way. They're cutting trees that are too big. That was your argument in your brief. Now you just came in and you're saying the preamble is something about whether there's overgrowth at all. I'm not sure what you're doing right now. So this case was remanded from our court previously by another panel, and really with one question. They wanted the Forest Service to explain why it reached the conclusion that among this overgrowth, it was permissible to trim trees that were, what, 21 dbh, 21 inch dbh? And they came back and they gave a reason. So now your challenge is to the reason that they gave. Well, there's two things going on there, and I'll jump to the fire issue, because apparently I didn't explain this well in the briefs. But from my perspective, the data they presented shows, for example, that there are 1.27 trees per acre in the 21 inch size class. That, to me, is obviously not an overgrown. We haven't established that those trees are in fact overgrown. I mean, my understanding of the term overgrowth as it used, and none of this has been presented to us as a disputed issue, but the overgrowth is a tree that has become too dense in the number, an area of forest that has become too dense in the number of trees. And then some thinning is permitted under the roadless rule to address an overgrowth problem. The size of the tree, the dbh of the tree, is not, as I understand it, to be termed overgrown. Like a tree is not overgrown when it reaches a certain size diameter. A forest is overgrown when there are too many trees. And I don't see any dispute about that understanding of overgrowth. And I think in DeCoya 1, the court basically said the purpose of this project is validated, and so I don't even think that could be a live issue under the law of the case. Well, let's jump to the fire issue then, Your Honors. To start with, the DeCoya 1 decision states that the Forest Service must explain why 21 inch trees in particular are creating the risk of wildfire the project seeks to ameliorate. And importantly, when providing that explanation, the DeCoya 1 court said that the Forest Service can't just say it. They must show it with particular technical analysis, and that's the real issue before us on the fire issue from my perspective. I read the decision, and it says, you know, it's because there are too many trees, and these trees of this size and the medium range of height are connecting, essentially, the canopy and producing a risk of wildfire. I mean, I don't understand why that's not an explanation. There's nothing that this court or myself can look to to say, here's why they chose 21 inches. Their explanation is that there's clusters of trees. They could have as easily said, these clusters show we need to cut up to 14 inches or 16 inches or 18 inches. They don't do what the DeCoya 1 court said they need to do, which is show specifically that 21 inch trees are a problem, not just, say, 18 inch or 16 inch. That's the problem. I think what our court said is the Forest Service failed to explain its determination that 21 inch DBH trees are generally small diameter timber. That's what we're here to talk about today, whether they have now explained that. You're now jumping to some other thing that, if you can point me to it, I'd be happy to look, but I don't think our court remanded to say, is there really a fire risk? Explain that or explain something about the relation of the trees and the fire risk. I think they said, explain why 21 inch trees are generally small diameter timber. And I thought that's what your brief was about too. Well, it is, but there's a whole section about this fire issue as well because the DeCoya 1 court very specifically said they hadn't explained why 21 inch trees are a fire problem. I think the court offered some reasons why they wouldn't just accept at face value a bald statement that 21 inch DBH is generally small diameter timber, and they said, you know, we have some reasons to believe or just to question that. And then they said, we're not going to tell the service exactly how they should explain this. They don't have to follow any particular methodology for explaining this. So the service went, provided an explanation, and now I think you have to explain why you think that explanation is insufficient, essentially arbitrary and capricious as a matter of law. Going back to the DeCoya 1 decision, it says an agency's determination is arbitrary and capricious where it merely provides generic statements to support its conclusion in lieu of evidence that it actually applied its substantive expertise. I don't believe there's anything in the revised memo showing that they've exercised their substantive expertise. They just stated we have to go up to 21 to address these clusters of trees. They said that these trees have this growth possibility. They have the growth potential of, I don't remember the exact number, but much bigger than 21. And so given that, 21 is small. And I didn't see you challenge, sorry, I should know the exact number, 130 or whatever it is. I didn't see anything in your opening brief saying their factual assumption that the growth potential is 130 is factually wrong. We did argue, Your Honor, that it's not substantiated. They just, again, this is the problem. They're just saying that that's a fact without actually showing it. But they have expertise, and you didn't, I mean, I think to show that they use their expertise inappropriately, it would help to have you say, actually, these trees only grow half that size or something. But I didn't see anything like that that you did. Well, I think our point is that growth potential has nothing to do with determining which trees are overgrown in an area. That's the essence of the road list rule. But my understanding is the whole premise is that when the forest is overgrown, that the trees can't meet their growth potential because there are too many of them competing for resources, like water, nutrients, and then they don't reach their growth potential. So one of the purposes of thinning is to enable the trees that remain to actually meet their growth potential. So it seems to me entirely plausible. Again, I'm not a tree expert, but it seems the service's explanation that considering growth potential for determining what is a small DBH tree versus actual size, I mean, this is what they explain in the decision. We're not going to consider actual size because actual size has effectively been depressed by the overgrowth. And by the logging 40 years ago or whatever. Right, because we have no old growth, essentially. I'm not sure I follow because I feel like I'm repeating myself, so I apologize. But the intent of the rule is to limit logging to those places that are overgrown, and growth potential has nothing to do with that determination. It doesn't answer that question. So I just think you're mixing up the terms again. The Forest Service says this forest is so dense that there is fire hazard. If fire comes through and burns this whole thing, it's going to burn all your big trees and all the trees. So I don't see why you want that to happen. No, but the essential point that I think is not coming across, I apologize, is that we have to figure out which of those trees are actually part of the fire problem. Obviously these trees go up to 42 inches. So if we're saying it's overgrown, why can't we just log all the way up to 42 then? So my point is you have to draw the line somewhere, and they need to establish where they're drawing that line with a technical analysis, and they have not done that anywhere. We don't know why they picked 21. Well, they say, I mean, yes, there's always going to be some line drawing, but they say we picked 21 because the growth potential is over 100, and 21 is small compared to that. And the rule talks about generally small, so they're using an interpretation, and I'm not sure why it's an unreasonable interpretation or has any factual false premise. You haven't shown a factually false premise or a legal interpretation of the word small that makes it seem like it's wrong. How is that not arbitrated, just pick 21 out of a hat? Well, you always have to pick something. I mean, you want them to pick 12, but they could pick 11.5 or 12.5. It's always going to have some question that there's always a line. What I want them to pick, though, I acknowledge is irrelevant. What I want them to do is important here, and that's to provide a technical analysis that the DeCoyah 1 court said is needed. But they provide, I mean, you say they don't provide an explanation, but they say that the majority of the thinning of this project will occur within 0 to 14-inch diameter range. This will help accomplish the goal of reducing the ground and ladder fuels. So, I mean, there's a lot of explanation here about how targeting trees in this range will achieve the goal of reducing overgrowth and preventing the drastic wildfires. So I don't, again, I don't think our job is necessarily to, at this point, question, you know, the science behind this explanation. They provided one. It seems there's pages of reasoning here and explanation as to why they chose trees in this range. And they explained, I think, in response to DeCoyah 1, why 21-inch DBH constitutes generally small-diameter timber. For this particular location, given the dominant tree species that exists there. I mean, they've made it very specific to this particular location.  Jeffrey Pine. I'm sorry, I found the number. I guess they said 60 to 90, so when I was saying 100, that was a little exaggerated. But it's still the point that 60 to 90 is a lot more than 21. I agree that 60 or 90 is a lot more than 21, but it doesn't answer the question of what the roadless rule wants us to answer, is my perspective. The roadless rule specifically says we're not going to put a number on it because it has to be project-specific, species-specific, all these other things. How are their generic statements in this revised memo really any different than the generic statements that DeCoyah 1 found? The statement that Jeffrey Pine grows 60 to 90, potential growth is 60 to 90 inches, how is that a generic statement? Because it doesn't help us answer any aspect of the roadless rule. Whether a tree is small compared to its growth potential doesn't tell us whether there's a risk of wildfire. It doesn't tell us whether the area is overgrown. It tells us literally nothing about the roadless rule from our perspective. All right, you have about a minute left. Let's hear from the other side first, and I think they're dividing their time. Eleven minutes for the USFS, and then four minutes for the American Forest Resource Council. I apologize, you weren't asking a question, were you? I couldn't hear you. Oh, no, no, no, I'm calling your opposing council. Good morning, your honors. May it please the court. My name is Ezekiel Peterson, here representing the United States Forest Service. With me at council table is Sarah Gafore, representing the intervenors, American Forest Resource Council. My plan is to speak for 14 minutes before turning it over to the intervenors to speak for the remaining four. You have 11 minutes. Excuse me, 11 is correct. The Forest Service's analysis here was reasonable. They went back after remand and adequately substantiated their analysis about why the trees that would be thinned by this project were generally small diameter timber, comporting with the 2001 roadless rule. The Forest Service specifically added the analysis that this court said was missing in 1001, the prior decision, including stand-specific exams about the types of trees that are actually in this project area and a biological and scientific rationale about why the trees that would be harvested were generally small diameter timber. The district court correctly held that that analysis was reasonable, and this court should affirm. So I'm having trouble figuring out, like, what administrative law framework we should be in here. There has been discussion of Kaiser and our deference, but I don't think you've really embraced that approach in your brief. Can you explain whether you think we should be thinking about this as interpretation of the word small and using deference or what? From our perspective, Your Honor, this case doesn't present a question of regulatory interpretation because it's not really a question about the definition of the word small or the definition of the word generally. Those words carry their plain English meaning here, but the question is about whether the Forest Service was arbitrary and capricious in adopting a certain methodology to determine that under this particular set of facts, the timber that they would be thinning was generally small. So the appellant's plaintiffs say that the Forest Service has never relied on this growth potential idea to explain why something is small before. Is that true? We're not aware of a situation in which the Forest Service has relied on this particular rationale to explain in the roadless rule context why timber is generally small. But I think it's important to emphasize that this is the rationale that the Forest Service came up with when conducting this extra analysis on remand from this court. So the Forest Service took this court seriously on remand, went back after that mandate, and looked at what the best scientific or biologic rationale for what generally small diameter timber would be in this project area. But only in the context of this project? Is this the definition that you'd like to use? I mean, would the Forest Service like this to be the interpretation of generally small in all roadless rule interpretations in all projects? We're not necessarily setting out a definition or regulatory interpretation of generally small across all contexts. And I think the roadless rule itself acknowledges, or the regulatory preamble, I should say, to the roadless rule acknowledges that this determination was meant to be made on a site-specific basis, taking into account the different ecological considerations in the national forests. A national forest in Alaska is going to be a lot different than a national forest in Southern California. But for this project, it certainly was reasonable for the Forest Service to use this rationality. Why is it reasonable for this specific project? Because the Forest Service made the specific determination that Jeffrey pines in this project area can grow up to 60 or 90 inches. And compared to that growth potential, as well as the past management history on the site, which has resulted in there not being any trees that are currently at that growth potential, it's reasonable for the timber that will be thinned in this project to be generally small. And I want to emphasize the profile of the timber that will actually be thinned by this project. Seventy-three percent of the timber that will be harvested is less than 2 inches. That's at record page 47. Ninety-six percent is noncommercial, which is generally less than 10 inches at record page 49. And 98.5 percent is less than 14 inches, which is at record page 46. I think plaintiffs today have made a big deal about the fact that it was arbitrary for the Forest Service to choose this 21-inch number. But it's clear from the analysis in the revised decision memo why the Forest Service decided to include thinning of 14- to 21-inch trees in this project. The one thing that troubles me a little bit about what you said to us a few moments ago is that is the rationale on this decision the rationale that the Service had for choosing 21 inches, or is it a post hoc explanation when you were told to provide one and you came up with an explanation? And it seemed to me you suggested we just found an explanation that fit the scientific evidence. I think the Forest Service went back on remand and determined that this was generally small-diameter timber consistent with this court's mandate in the 2Q01 decision. And it did that analysis based on the two prongs that it discusses in the revised decision memo. So one was that generally small-diameter timber analysis based on the benchmark of the species growth potential on the site, which is a static benchmark that doesn't change based on past management history or disturbance history or wildfire history of the site. But second, the Forest Service explained that even if, for the sake of discussion, some of the relatively larger trees that would be harvested here, the 14- to 21-inch trees, were not considered small, the project would still remove generally small-diameter trees. The plaintiff's proposed interpretation of this regulation would essentially say that the Forest Service can only harvest small-diameter timber from roadless areas. That's not something that's in the regulation. The Forest Service could have written the regulation that way, but it didn't. So this word generally has to be given some meaning. That's where you get into, I think, Judge Friedland's question about did you waive, essentially, that we should give our deference to that interpretation of the rule. Your Honor, I think, again, the answer there is that there's no question of regulatory interpretation here because the word generally carries its plain English meaning. You rely on that it's clear. Yes, we're not asking for our Kaiser deference. The Forest Service's rationale here was not arbitrary compression. So your argument is generally doesn't mean that all of the cutting, sale, removal has to be of small-diameter timber. That's correct, Your Honor. At most, I guess, it has to be. Yes, Your Honor, because the Forest Service could have written a regulation that says small-diameter timber thinning is permissible or only small-diameter timber thinning is permissible. It didn't. It wrote a regulation that says generally small-diameter timber thinning is permissible. Here, 73% of the trees are less than 2 inches. 98.5% of the trees are less than 14 inches. So it seems like this project seems like it fits within this generally small, but it seems like the interpretation that you'd like us to say is clear would allow much more cutting of much bigger trees, and it seems a little bit troubling as an argument that, like, as long as you're cutting 51% small trees, you could cut giant sequoias. I'm not sure that's a great argument for the Forest Service to be making as what this means. So under the roadless rule, that hypothetical would probably not be permissible, and that's because there's other prongs of the roadless rule analysis that are driven by these ecological considerations. So certainly in this case has really been whittled down to just this issue of generally small-diameter timber, but it didn't start that way. Initially, the plaintiffs had also challenged whether or not this project would maintain or improve roadless area characteristics, and this court said in Takuya 1 that it would, that that part of the Forest Service's analysis was satisfied. So that is always something that the Forest Service has to consider when harvesting or when thinning timber in roadless areas, as well as whether or not the timber thinning would promote the protected species habitat and maintain ecosystem composition and structure. If I understand the Forest Service's decision, did we only reach the question of whether the rule can be interpreted as permitting some logging of non-small trees if we do not find the potential growth rationale to be sufficient? Yes, Your Honor. We agree with that. We think here, compared to the growth potential on the site, which the Forest Service, they're the experts here, they're the government's forest management silviculture agency, they work with this national forest. They determined that for this site, that's the growth potential. I understand plaintiffs' argument about this, a few different ones, aside from that, you know, they're arguing that the rule just does not allow consideration of potential growth, but they also say that in this particular case, I think the service essentially didn't provide any evidence to back up its factual assertion that the potential growth of Jeffrey Pine is 60 to 90 inches DBH. So can you address that argument? If that is the potential growth of the Jeffrey Pine, why isn't there any evidence cited in the decision to back that up? Well, I think I would go back to the fact that the Forest Service is the government's expert agency that is making these determinations on a regular basis, and they haven't provided any evidence that shows that the growth potential is not 60 to 90 inches. The agency here is entitled to a presumption of regularity as to the determinations that it's making about the trees on the national forest that it manages, and we think that there's no evidence that shows that that was a clear error of judgment. So you think the service can make statements of fact as long as they're acting within their technical expertise, they don't have to provide any sort of supporting citations for that, unless in the case the plaintiff would bear the burden of showing that there's some true genuine question about that? We certainly believe that there's no requirement for the Forest Service to provide a citation to publish scientific literature for every factual assertion they're making, and that's especially true. What about a very significant one, the one in which the whole determination relies? We don't think they would need to so long as here they're making that determination based on their expertise, they're the agency that manages this, they're on the ground, and the plaintiffs haven't provided any evidence showing that that. If they had, would it be different? If they had, then maybe we would be in different territory. I had a similar question about the crown thinning. It wasn't obvious to me. It seems like the biggest concern is the 14 to 21 DBH, and it seems like your explanation is we need to do some crown thinning for fire prevention, but that also sort of seemed floating out there without much explanation. Your Honor, I would say the analysis in the revised decision memo on this is at record page 50, and I would also point the court to the fire and fuels report, which discusses the impacts of a crown fire on forest health at record page 61. These crown fires are the most catastrophic destructive forms of wildfires if the fire gets established in the crown of trees, and it has the opportunity to really destroy the forest. So I understand that, but is there anything that links the 14 to 21 to that? I would look at the statement on record page 50 saying that thinning trees 14 to 0 inches diameter would accomplish the project goals of reducing surface fuels and ladder fuels but would not have any impact were a fire to reach the crowns of the trees. So the Forest Service determined, based on its analysis of the stands, that a very limited number of 14 to 21 inch trees would have to be thinned in order to address that crown fire risk. Okay, it just didn't seem very well spelled out. It didn't really say 14 to 21 are this height and that's the crown. No, it doesn't say that specifically, but it does address why those 14 to 21 inch trees are creating the crown fire risk that would be ameliorated by the thinning. Unless the court has any further questions, we would ask this court to affirm. Thank you. All right, thank you. Ms. Ghaffori? Ms. Ghaffori? May it please the court, Sarah Ghaffori on behalf of Defendant Intervenors. So the Takoya Project is a much-needed fuel break, and it's long overdue. The Community Wildfire Protection Plan in its 2009 update identified it as a priority and one that needed to be established within five years. Now, turning to the sole issue before this court of whether the Forest Service adequately demonstrated that thinning up to 21 inches meets the generally small diameter timber requirement, the Forest Service's revised decision memo is much more robust than what was originally before this court in the first round of litigation. Now, on remand, the agency has provided data related to its stand exam analysis, and as Mr. Peterson noted, 98.5% of this thinning is in that 0 to 14 inch size class, and then we only have 1.5% or three trees per acre that are in that 14 to 21 inch. And your clients are here because of that last 1.5%? No, Your Honor. Actually, when we submitted declarations in support of intervention, it was about forest health concerns and about wildfire risk. It wasn't about the commercial nature, and in fact this contract has been awarded to a nonmember of the three intervenors. Oh, that's interesting. So I guess that's not in the briefs before us because you were already intervenors. What is the interest then? Who are you representing, and why are they here? American Forest Resource Council, California Forestry Association, and Associated California Loggers. There is a declaration in intervenors' executive records that explains intervenors' interests as it relates to American Forest Resource Council. What is it? Tell us. Oh, it's about forest health concerns. Because our members care and depend on public timber and want to ensure a sustainable supply, we want to ensure that there's continued forest health, there aren't wildfire issues on public lands. That's our interest. But I want to focus on the growth potential here because what the agency did is it made a site-specific determination. It looked at the growing conditions of this project area. It looked at soil. It looked at climate and determined as a factual matter that those are moderately good, such that it's reasonable to expect that Jeffrey Pine can grow 60 to 90 inches. They didn't look at the growth potential generally, but for this specific site. And this court's case law has said that... Wait, is that true? I thought that was really more general. No, it's at Excerpts of Record 49. They made a site-specific determination in that first paragraph. And the Forest Service must have the discretion to rely on the reasonable opinions of its own experts, and this is stated in Lands Council v. Martin, which we cite in our briefs. I guess we don't have a site for it, so it's hard to know. You're right that it says that they could grow 60 to 90 in the project area, but... And it looked at site-specific conditions. It said soil, climate. It looked at those conditions. It determined that they're moderately good, such that it's reasonable to expect that Jeffrey Pine... But that must be based on how big they grow somewhere else because they're not growing that big here, right? Right. It's based on their own professional judgment and expertise on looking at site productivity and determining by evaluating that, by determining that it's moderately good, that they can achieve that growth potential. That might not be true in other locations, but it's true here. And it's consistent with what the preamble directs the agency to do when looking at ecological considerations. Site productivity is a consideration that the agency should take into account. And I want to answer your question about deference, and you talked about Kaiser and Auer, but the appropriate deference here is the Lands Council v. McNair, the Lands Council v. Martin-type deference, which is matters that are within their expertise, that are highly technical, and certainly size classification is one of them. That is entitled to deference. I think we're only talking about Auer deference when it comes to the interpretation of the terms generally small diameter. So that's Auer-level deference, but there's that McNair-type deference about agencies being entitled to deference of matters of their expertise. In terms of your question about scientific, whether some sort of scientific study... Sorry, sorry, I'm not sure what you mean by that. Do you not think we have to interpret small and generally and instead should use some other kind of deference? What are you saying? We submit that, based on this record, this court need not address the Auer line of deference because all of these trees are deemed small under the growth potential analysis. And the court only needs to address the plain meaning of generally if this court were inclined to find that some of these trees were not small. And then... And so you don't think we have to interpret the word small to then talk about whether these are small? Well, small is a factual determination that the agency makes, and the regulation was clear that it wasn't going to define that in that it was going to be guided by ecological considerations and that the agency could make that determination based on site-specific analysis or land management plan analysis. So it's a factual determination, but what is entitled to deference is if the agency rationally explained the facts found and the conclusions made, that they are entitled to deference because this is a matter within their expertise. What about the interpretation of the rowless rule as permitting a potential growth rationale? I mean, that requires some level of interpretation of the rule. I'm sorry, Your Honor, I didn't hear your question. Sure. So I think there is a sort of threshold question of whether the agency can interpret the rowless rule as permitting it to use potential growth rationale. As a methodology. And again, I would point the court to Lance Counsel V. Martin, which says this court will not second-guess an agency's choice of methodology. So is that a tech... I mean, if it's a technical issue, right, we owe deference to the agency's technical expertise. But if it's an interpretive issue, we have to interpret the blank. That's a legal issue. That is a legal issue, but this rowless rule does not prescribe a one-size-fits-all approach. It gives the agency a lot of flexibility in its site-specific determination of how it deems something as small. And that's a factual determination, and that factual determination is entitled to deference. I see I'm over time, so if I may quickly conclude. Yes, you may conclude. Okay, thank you, Your Honor. The Forest Service rationally explained its small-diameter timber determination in compliance with this court's remand order, and this court should uphold this important fuel break that will help the communities in the wildland urban interface. Thank you. Thank you, counsel. Mr. Augustine. Thank you, Your Honors. A critical point I want to go over here that gets to your point about 14 to 21 inches sitting out there, and that's this fact. There's a technical analysis in the record. It's the Fire and Fuels Report, and it specifically says that ER-57, the largest fuel in the project area, is, quote, small tree understory, not 21-inch overstory. They point it to page 61. ER-61, fuel reduction treatments are designed to remove, quote, existing hazardous fuels, and they give us examples, forest floor, ladder fuels, or in the crowns. But that's a generic criteria. It's not saying that there are, in fact, crowns or an overstory problem in this situation. So when you look at the page where they actually address the DeCoya project, ER-57, it speaks only to small tree understory, and when you add up the percentages, it covers the entire project area, 100%. So I think, at the very least, Your Honors, for this case not to be arbitrary and capricious, they would have to explain why their overstory finding, that to my perspective is a generic statement, contradicts their actual technical analysis that only finds that they should log small tree understory. Okay. I'm not sure I understood in your brief that you were saying there's no overstory or crown in this forest, but if you had argued that, I would be confused because wouldn't every forest have some top? I don't really understand how there could be no top to the forest. Oh, there's always top. Yes, I understand your point, but that doesn't mean they are a problem from a fire perspective. The analysis that was done on page 57 of the ER says, let me go there real quick, to Koya fuel type, and it lists them all, and none of them that are listed include the overstory. So that means that for this particular project area, they found that overstory wasn't an issue, in this report at least. And so there's a discrepancy between the actual technical analysis that exists in the record and their generic analysis that says, well, we also feel we have to go up into the overstory. Did you point that out in your brief? Yes, this is in the opening brief in the fire section. We highlighted that, or so I thought. All right. Thank you, counsel. You're over your time. Los Padres Forest Watch versus the USFS is submitted.
judges: WARDLAW, FRIEDLAND, SUNG